(No. 5305— )

SAMUEL STEVENSON, ET AL., Claimants, *v.* STATE OF ILLINOIS, DEPARTMENT OF PUBLIC WORKS AND BUILDINGS, DIVISION OF HIGHWAYS, Respondent.

*Opinion filed November 7, 1977.*

5

Lyman R. Fort and Driszer, Stansell & Crister, Attorneys for Claimants.

William J. Scott, Attorney General; William E. Webber, Assistant Attorney General, for Respondent.

Polos, C.J.

This is an action in 32 counts, brought on behalf of 59 individual Claimants to recover damages to the properties of Claimants damaged by the flooding of the Mississippi River in 1965. Claimants seek a total of $1,275, 959.03 in damages for loss of crops, livestock, buildings, farm personality, cost of repairs and depreciation in land value.

Because of the large number of Claimants, the complexity of the proof of damages, and the amount of damages claimed, issues of liability and damages were segmented. The sole issue before the Court is whether the State is liable for the damages incurred by Claimants. Should the Court find for Claimants on that issue, the case would be remanded for further hearings on the damage issue.

The record herein establishes that on November 24, 1925, the Illinois Commerce Commission promulgated Order No. 14492 permitting the Illinois Department of Public Works and Buildings, Division of Highways, to tunnel under the tracks of the Chicago, Burlington and Quincy Railroad Company, at a point about seven miles southwest of Gladstone, in Henderson County, Illinois, for the purpose of constructing a subway through which State Bond Issue Route No. 8 (later known as Route 34) could pass. The order was

issued upon the Commission examining and approving an agreement entered into between the railroad and the Department of Public Works and Buildings covering the construction, maintenance and expense of the undercrossing thus to be formed. The railroad at this point was built across low lying lands and the tracks were built upon an embankment which, although not constructed for that purpose, acted as a secondary levee against high water along the Mississippi River. The main levee was about a mile to the west along the banks of the Mississippi River. Along with the underpass, there was to be built as per the above agreement, a horseshoe shaped levee in the river side of the railroad tracks for the purpose of preventing flood waters from flowing through the underpass and onto the low lying lands south of the tracks.

As seen from a photograph in the record identified as Respondent's Exhibit 1, and an engineer's drawing identified as Claimant's Exhibit 1, the levee commenced by abutting onto the north side of the railroad tracks at a point where the tracks ran roughly east and west. From its point of origin it ran in a straight line northerly 787 feet to a point where it met Route 34. It then followed the east side of Route 34 back to the railroad tracks a distance of 970 feet, as Route 34 curved south-easterly in an arc to the underpass, the underpass being located approximately 625 feet east of the levee's point of origin.

The term "horseshoe" levee is somewhat misleading. From the air the structure presented more the appearance of a right triangle with a "curved" hypotenuse, the railroad tracks serving as the base of the triangle, the west arm of the levee serving as one side of the triangle, and the curve of Route 34 abutted by the east arm of the levee constituting the hypotenuse.

The levee was eight feet wide at the top, 70 feet wide at the base, 20 feet high on the river side, with a sand core, and rested on a sand base. Within the triangular space formed by the two arms of the levee and the railroad embankment was a small body of water known as the "fish hatchery pond."

The levee held at all times until April 27, 1965. The primary levee system had failed a day earlier, and flood waters of unprecedented height were forced against the horseshoe levee. Portions of the levee were undermined and washed away.Attempts by the Division of Highways to plug the underpass failed and the low lying lands of the Claimants were subjected to the uncontained flood waters of the Mississippi River.

The levee collapsed because of a process known as piping. The pressure of the flood waters outside the west arm of the levee was sufficiently great that the water was able to open a subterranean channel beneath the levee and create a boil in the low pressure area of the fish hatchery pond located inside the levee. At the time of the boil there was a difference of 15 to 20 feet between the height of the water on the river side of the levee and the water in the pond, with a resulting discrepancy in the respective water pressures. When the boil was first discovered it appeared as a swollen spot in the pond, in about four to six feet of water, about 12 to 15 feet from the nearest levee embankment. To contain a boil properly it should be ringed with sandbags to build up the pressure within the contained area, but the men working at the site had no way to reach the boil. All they could do was try to seal it by throwing sandbags on top of it from the embankment. Within a short time a vortex had developed on the flood side of the levee so that the flood waters rushed into the vortex, ran underneath the levee, and boiled up like a

fountain in the fish hatchery pond. Sandbags thrown into the vortex were carried underneath the levee and tossed up into the air on the pond side of the levee. The subterranean piping of the water eroded the base of the levee sufficiently so that a portion of the west arm of the levee sank into the opening beneath it and left a gap through which the flood waters entered the entire inner area. They entered with such force that they blew out and splintered a wooden plug which had been installed in the Route 34 underpass to contain them.

Thereafter other portions of the levee gave way. Photographs in the record show the extensive damage done by the flood waters to Claimants' land and buildings as they poured through the Route 34 underpass onto the adjoining low lands.

Claimants charge the State for their loss in the following language appearing in each Count of the complaint:

"5.... that Respondent in violation of its duty and in violation of Illinois Commerce Commission Order No. 14492, failed to adequately maintain said horseshoe levee for a long period of time prior to April 27, 1965; that on April 26, 1965, the Mississippi River broke over the levee on the West, Northwest of the horseshoe levee and into the Henderson Creek area and that in its normal flow and course, it proceeded to the Chicago, Burlington and Quincy right of way levee and the horseshoe levee herein referred to; that then in the afternoon hours of April 27, 1965, the horseshoe levee, which was to be constructed and maintained by Respondent so as to restrain and hold back the flood waters of the Mississippi River, broke and gave way as a direct and proximate result of Respondent's failure to maintain it in violation of Illinois Commerce Commission Order No. 14492, so that the lands to the south and southeast therefrom, including Claimants', were flooded and placed under water with resultant damage."

It is thus Claimants' theory of this case that Respondent violated Illinois Commerce Commission Order No. 14492, and its contract with the Chicago, Burlington and Quincy Railroad, by failing to properly maintain the levy. Claimants assert that they are the third party beneficiaries of that order and agreement,

and that they therefore have the right to bring suit for damages sustained by them as a result of Respondent's alleged breach of that order and agreement.

Respondent contends that Claimants were not the intended third party beneficiaries of the aforesaid order and agreement and that they therefore have no standing to sue. Respondent also asserts that it did not breach any of its obligations under the order and agreement with respect to maintenance of the levy.

We do not find it necessary to reach the issue of whether Claimants were the intended third party beneficiaries of the aforesaid agreement and order, and therefore have standing to sue for their breach. If Claimants are to prevail on their breach of contract theory, they must prove by a preponderance of the evidence that the levee was not properly maintained, and that the failure of Respondent to maintain the levee was the proximate cause of the damage to Claimants' lands.

Claimants' witnesses testified that the west arm of the levee was overgrown with trees and brush, and that there were ground hog holes on the west side. However, brush and ground hog holes did not cause or even contribute to the collapse of the levee. The record is clear that the levee failed because of a subterranean process known as "piping." Al Malmquist, a Maintenance Field Engineer for the Department of Transportation, was an eyewitness to the collapse of the levee. He testified that water did not come thru ground hog holes on the slopes of the levee, but rather that it boiled up within the fish hatchery pond too far from the banks of the levee for the State workers to contain the boil by surrounding it with sandbags. Similarly, the brush and trees on the top of the levee had nothing to do with its collapse, as all interfering brush and trees were

removed by bulldozers in time to permit State employees and volunteers to build the levee to an additional height prior to its collapse.

The Court therefore finds that the "horseshoe" levee failed not because of the allegedly faulty maintenance, but rather because of the piping of the flood waters of unprecedented intensity underneath the levee. This incident was unrelated to the condition of the levee, and Claimants have thus failed to prove that any breach by Respondent caused the damage to their lands.

It is therefore ordered that this claim be denied.